[No. 51133-1. En Banc. August 7, 1986.]

*In the Matter of* LORETTA SCHUOLER.

NEAL McCARTHY, ET AL, *Respondents*, v. LORETTA SCHUOLER, *Appellant*.

*Bothwell & Lorello* and *Thomas Bothwell,* for appellant.

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *John C. Monter, Deputy,* for respondents.

*John H. Hertog, Jr.,* and *George Yeannakis* on behalf of Seattle–King County Public Defender Association, *Michael Mirra* on behalf of Evergreen Legal Services, and *Neil R. Sarles* on behalf of the American Civil Liberties Union, amici curiae for appellant.

*Robert M. Schaefer, Kurt W. Melchior, Jan T. Chilton,* and *A. Megan Evans* on behalf of the International Psychiatric Association for the Advancement of Electrotherapy and *Kenneth O. Eikenberry, Attorney General,* and *Karen McCarty Lundahl, Assistant,* amici curiae for respondents.

Utter, J.—Appellant Loretta Schuoler challenges the trial court's authorization of electroconvulsive therapy (ECT) pursuant to the involuntary commitment statute. We agree that the ECT hearing below violated both statu-

tory and due process requirements.

A friend brought Schuoler to the Yakima Valley Memorial Hospital on August 11, 1983. At that time Schuoler was disoriented and refused to take the medication that had been prescribed for her during an earlier admission. She had not been eating or sleeping well and was unable to communicate her birth date or address when questioned by the admitting mental health professional. This was her fourth admission to the hospital due to mental illness since March 1983.

A hearing was held on August 16, 1983, pursuant to RCW 71.05.230, to determine whether there was probable cause to involuntarily commit Schuoler for evaluation and treatment for 14 days. The trial court found Schuoler to be "gravely disabled" and authorized a 14–day involuntary commitment.

At the hearing, the treating psychiatrist, Dr. Neal McCarthy, asked the court to authorize ECT for Schuoler. Her attorney objected because she had received no notice that authorization for ECT would be requested. She also asked that Schuoler be examined by another mental health professional, as required by RCW 71.05.370(7). The trial court set a hearing on the authorization of ECT for the next morning.

After the hearing to determine probable cause for commitment, the prosecutor informed Schuoler's attorney that two psychiatrists were available to interview Schuoler and to testify on her behalf at the hearing on the next day. Schuoler's attorney originally agreed to the appointment of Dr. Frank Hardy, but later objected to his appointment at the ECT hearing after discovering that Dr. Hardy supported the authorization of ECT for Schuoler.

The evidence before the court in the ECT hearing consisted almost entirely of the testimony of Drs. McCarthy and Hardy. Both psychiatrists testified that ECT is a medically accepted form of treatment for patients who are mentally ill, particularly those suffering from depression. Both discussed the benefits and risks of ECT, and testified

that ECT was the indicated treatment in a case such as Schuoler's, where the patient had shown no improvement while on drug therapy and had in the past been able to function outside of a mental institution as the result of ECT. Dr. Hardy testified that without ECT Schuoler might regress into a vegetative state and be confined to the back wards of a state hospital for the rest of her life.

Ms. Schuoler's attorney challenged the physician's testimony. She proved that despite Dr. McCarthy's assertion that ECT had helped Schuoler 2 years earlier, Schuoler had actually returned to the hospital within a week of treatment. The attorney also tried to introduce evidence that a Seattle psychiatrist had diagnosed Schuoler differently than McCarthy.

After this testimony the trial court concluded that there were medically accepted indications that ECT would benefit Schuoler and that any risks of the treatment were minimal. The court ordered Schuoler to undergo ECT at the discretion of her treating psychiatrist. Her request for a stay pending appeal was denied. The case was transferred to this court from Division Three.

Initially we should point out that since the trial court refused to stay Schuoler's treatment pending appeal this case is moot. This court cannot provide effective relief for the parties involved. *See State v. Turner,* 98 Wn.2d 731, 658 P.2d 658 (1983). Nevertheless, we will decide the merits of the controversy. We have repeatedly issued opinions on otherwise moot questions that are of substantial public interest. *See, e.g., Dunner v. McLaughlin,* 100 Wn.2d 832, 676 P.2d 444 (1984).

Schuoler raises several challenges to the trial court's order that she submit to ECT. The court acted pursuant to RCW 71.05.370, which provides:

> Insofar as danger to the individual or others is not created, each person involuntarily detained, treated in a less restrictive alternative course of treatment, or committed for treatment and evaluation pursuant to this chapter shall have, in addition to other rights not specifically

withheld by law, the following rights . . .

. . .

(7) Not to consent to the performance of shock treatment or surgery, except emergency life-saving surgery, upon him, and not to have shock treatment or nonemergency surgery in such circumstance unless ordered by a court pursuant to a judicial hearing in which the person is present and represented by counsel, and the court shall appoint a psychiatrist, psychologist, or physician designated by such person or his counsel to testify on behalf of such person;

Schuoler argues that a court cannot order ECT pursuant to RCW 71.05.370(7) for a nonconsenting individual without relying on the guardianship proceedings of RCW 11.88 and 11.92. Schuoler also argues that the court's order of ECT violated her constitutional right to refuse treatment. Schuoler challenges the procedures of RCW 71.05.370(7) to be so inadequate that the statute violates her procedural due process rights. Finally, she argues that the court below abused its discretion when it denied her motion for a continuance. We examine each contention in turn.

## A

## Guardianship Statutes

Schuoler argues that a court cannot order ECT for a nonconsenting patient without first determining that person's competency. Schuoler argues that if the person is found competent, the court cannot order ECT against that person's wishes. If instead the person is found incompetent, Schuoler argues that the court must appoint a guardian and proceed under the guardianship statutes, RCW 11.88 and 11.92.

We disagree that the Legislature intended courts to undertake competency determinations and guardian appointments in conjunction with ECT hearings. Although the guardianship statutes and the involuntary commitment statute may apply to some of the same people, the statutes operate independently to achieve different purposes. The purpose of the guardianship statutes is to provide a means by which another person may exercise the decisionmaking

power of an individual who is not legally competent to make decisions. RCW 11.92.040; *In re Ingram,* 102 Wn.2d 827, 838–39, 689 P.2d 1363 (1984). The involuntary commitment statute provides for the needs of a different group of people, individuals who are a danger to themselves or to others, or who are gravely disabled. These individuals may or may not be legally competent. RCW 71.05.450.

Guardianship proceedings would in large part be superfluous to ECT hearings. The guardianship statute specifically denies guardians the power to consent to ECT; instead, the statute directs guardians who believe such treatment to be necessary to petition a court for an order. RCW 11.92.040.[1] Thus, even if a guardian were appointed for purposes of a 71.05.370(7) hearing, the statutes direct that a court, not the guardian, make the decision to administer or withhold ECT.

We acknowledge that a guardian could be useful to a limited extent in an ECT hearing. Nevertheless, we do not agree with Schuoler that appointment of a guardian in an ECT hearing is necessary. A major goal of the involuntary commitment and treatment scheme of RCW 71.05 is to replace inappropriate, indefinite commitments with prompt evaluation and short–term treatment. RCW 71.05.010(1), (2).[2] Appointment of a guardian is a time–consuming pro-

---

[1]RCW 11.92.040 provides in part: "[N]othing in this section shall be construed to allow a guardian, limited guardian, or standby guardian to consent to:

"(a) Therapy or other procedure which induces convulsion;

"(b) Surgery solely for the purpose of psychosurgery;

"(c) Amputation;

"(d) Other psychiatric or mental health procedures which are intrusive on the person's body integrity, physical freedom of movement, or the rights set forth in RCW 71.05.370.

"A guardian, limited guardian, or standby guardian who believes such procedures to be necessary for the proper care and maintenance of the incompetent or disabled person shall petition the court for an order . . ."

[2]RCW 71.05.010 introduces RCW 71.05 by providing in part:

"The provisions of this chapter are intended by the legislature:

"(1) To end inappropriate, indefinite commitment of mentally disordered persons and to eliminate legal disabilities that arise from such commitment;

cess, and could frustrate the goals of RCW 71.05.

B

RIGHT TO REFUSE ECT

Our conclusion that a court does not need to appoint a guardian for an ECT hearing does not mean that a court does not need to consider a patient's wishes about ECT. This court has recognized the "fundamental principle" that competent adults have a right to determine what shall be done to their own bodies. *See Smith v. Shannon,* 100 Wn.2d 26, 666 P.2d 351 (1983). *See also* RCW 7.70.050. This right is grounded in both common law and constitutional principles. *In re Ingram, supra; In re Colyer,* 99 Wn.2d 114, 119, 660 P.2d 738 (1983). *See also People v. Medina,* 705 P.2d 961, 967 (Colo. 1985); *Holmes v. Silver Cross Hosp.,* 340 F. Supp. 125 (N.D. Ill. 1972). In *In re Ingram, supra,* we ruled that a court asked to make a substantive medical treatment decision for an incompetent individual must attempt to decide as that individual would if competent.

An individual's right to refuse ECT is an especially important issue because of the nature of ECT. Electroconvulsive therapy is a highly intrusive medical procedure. Adverse side effects of ECT are documented in both the record and scholarly articles. "Memory loss [both short- and long-term] has long been recognized to be a prominent effect of electroconvulsive therapy (ECT)." American Psychiatric Ass'n, Task Force Report 14, *Electroconvulsive Therapy* 57 (Sept. 1978). Impairment of ability to learn new material is cumulative with successive treatments, and it has been demonstrated that bilateral ECT (the type administered to Schuoler) produces a greater impairment of new learning capacity than right unilateral ECT.

Schuoler's counsel argues that the constitutionally protected right to privacy recognized by both this court and the United States Supreme Court includes privacy of the

---

"(2) To provide prompt evaluation and short term treatment of persons with serious mental disorders;"

mind and freedom from unwanted ECT. We agree.[3] This court has decided that an individual found incompetent retains the right to choose one type of medical treatment over another, or to refuse medical treatment altogether. *In re Ingram, supra.* We extend the reasoning of *Ingram* to conclude in this case that a person involuntarily committed due to a mental disorder retains a fundamental liberty interest in refusing ECT.

A court asked to order ECT for a nonconsenting patient must therefore consider the patient's desires before entering an order. The court should consider previous and current statements of the patient, religious and moral values of the patient regarding medical treatment and electroconvulsive therapy, and views of individuals that might influence the patient's decision. If the patient appears unable to understand fully the nature of the ECT hearing—as severely mentally ill patients often are—the court should make a "substituted judgment" for the patient that is analogous to the medical treatment decision for an incompetent person. *See In re Ingram, supra* at 838–42. Finally, the court should enter a finding on the nature of the patient's desires.

In this case, both doctors testified that discussing ECT with Schuoler was futile. The court thus should have made a "substituted judgment" for Schuoler. However, the court made no attempt to inquire into the views of individuals close to the patient. The court apparently accepted Dr. McCarthy's hearsay testimony that Schuoler's family was not interested in her treatment, and the court refused to provide Schuoler's counsel sufficient time to attempt to call

---

[3]The United States Supreme Court has not directly decided whether a person who has been involuntarily committed due to mental illness retains a federal constitutional right to exercise control over treatment decisions. *Mills v. Rogers,* 457 U.S. 291, 299 n.16, 73 L. Ed. 2d 16, 102 S. Ct. 2442 (1982). That Court has decided that confinement alone does not eliminate one's right to refuse treatment for a mental disorder, *Vitek v. Jones,* 445 U.S. 480, 493–94, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980), and that confinement for treatment purposes does not eliminate one's constitutional liberty interests. *Youngberg v. Romeo,* 457 U.S. 307, 315–16, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982).

Schuoler's family to testify. The court made no findings about the desires of Schuoler or her family members. We conclude that the court failed to conduct the investigation necessary to make a "substituted judgment" for Schuoler.

C

STATE'S POWER TO ORDER ECT

The State can act in derogation of Schuoler's right to refuse ECT even if that right is constitutionally protected. A state can limit even fundamental liberty interests by regulations (1) justified by a compelling state interest, and (2) narrowly drawn. *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973). These strict due process guidelines are appropriate for limiting the application of RCW 71.05.370(7). We conclude that a court can order imposition of ECT upon a nonconsenting involuntarily committed patient when the petitioning party proves (1) a compelling state interest to administer ECT, and (2) that ECT is both necessary and effective for furthering that interest.

In prior cases this court has acknowledged certain state interests sufficiently compelling to justify overriding a patient's objection to medical treatment. Four state interests commonly listed are:

> (1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) maintenance of the ethical integrity of the medical profession.

*Ingram,* at 842, quoting *Colyer,* at 122. Thus to satisfy the first prong of the due process inquiry a court asked to order ECT for a nonconsenting patient should consider whether a countervailing state interest as compelling as those listed in *Ingram* and *Colyer* exists.[4]

---

[4]As a practical matter, a court probably can find a compelling state interest to treat an involuntarily committed person with ECT relatively often. The State can commit persons involuntarily only if they are "gravely disabled" or present a likelihood of serious harm to others or themselves. RCW 71.05.210, .230, .280. "Gravely disabled" means that the person "as a result of a mental disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his

To satisfy the second prong of the due process inquiry a court must determine whether ECT is both necessary and effective. The court should consider medical prognosis with and without the treatment, as well as alternative treatments available. Finally, after making both inquiries, the court should set forth relevant findings to support its conclusions.

In this case, the court's decision begins to meet constitutional requirements. The doctors' testimony reveals a compelling state interest in treating Schuoler. Dr. McCarthy testified that because of her disabilities and repeated admissions to medical facilities Schuoler has constituted a tremendous financial burden for the State, Report of Proceedings, at 15; Dr. Hardy testified that without treatment Schuoler "may end up in the back wards of [a] state hospital, a helpless creature that nobody can ever take care of." Report of Proceedings, at 53. Both doctors testified that drug therapy was not helping Schuoler, and that with ECT she had an 80 percent chance of recovery.

D

Procedural Due Process

Schuoler raises several procedural due process challenges to the ECT hearing authorized by RCW 71.05.370(7). She argues that the statute provides so few standards that it violates due process. Specifically, she asks this court to (1) provide a right to trial by jury, (2) impose a strict burden of proof on the state, and (3) provide explicit standards for the administration of ECT.

This court repeatedly has recognized that due process guaranties must accompany involuntary commitment for mental disorders. *See, e.g., Dunner v. McLaughlin,* 100 Wn.2d 832, 676 P.2d 444 (1984); *In re Cross,* 99 Wn.2d 373, 662 P.2d 828 (1983); *In re Harris,* 98 Wn.2d 276, 654 P.2d 109 (1982); *In re Levias,* 83 Wn.2d 253, 517 P.2d 588 (1973); *In re Quesnell,* 83 Wn.2d 224, 517 P.2d 568 (1973).

---

essential human needs . . . or (b) manifests severe deterioration in routine functioning . . ." RCW 71.05.020(1).

In *In re Harris, supra,* we adopted the balancing test of *Mathews v. Eldridge,* 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976) for reviewing involuntary commitment procedures. Under the *Mathews* test a court reviewing the constitutional adequacy of statutory procedures must consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Harris,* at 285, quoting *Mathews,* 424 U.S. at 335. At least twice we have decided that procedural due process considerations required supplementation of the involuntary commitment procedures of RCW 71.05. *See, e.g., In re Cross, supra; In re Harris, supra.*

The statute allows ECT to be administered without an individual's consent only by court order after a judicial hearing. RCW 71.05.370(7). The involuntarily committed individual must be present at this hearing and must be represented by counsel. Included in the requirement of a judicial hearing are the rights to present evidence, to cross–examine witnesses, to be proceeded against under the rules of evidence, to remain silent, and to view and copy all petitions and reports in the court file. *Dunner v. McLaughlin, supra* at 840.

The statute does not specify a standard of proof. We agree with Schuoler that the State should have to prove each element justifying the authorization of ECT under RCW 71.05.370(7) with "clear, cogent, and convincing" evidence. The statute already requires the State to meet this evidentiary standard in order to commit a person involuntarily for 90 days. RCW 71.05.310; *Dunner v. McLaughlin, supra.* The privacy interest that will be affected by imposition of ECT is at least as great as that affected by involun-

tary commitment to a state hospital, especially when the long-term side effects of ECT are considered. Accordingly, the State should bear the same burden of proof in both 90-day involuntary commitment hearings and involuntary ECT hearings. *Accord, People v. Medina,* 705 P.2d 961 (Colo. 1985); *In re Roe,* 383 Mass. 415, 421 N.E.2d 40 (1981).

Schuoler also argues that she is entitled to a jury trial. The statute provides that the decision to authorize ECT shall be made "by a court pursuant to a judicial hearing." RCW 71.05.370(7). This language indicates that the Legislature did not intend that the decision be made by a jury. *Cf.* RCW 71.05.310. In some situations, due process does not even require that a judicial officer function as the neutral fact finder; review by independent medical professionals can be sufficient. *Parham v. J.R.,* 442 U.S. 584, 607, 61 L. Ed. 2d 101, 99 S. Ct. 2493 (1979). Here, review by a judge provides sufficient protection against an erroneous decision. The lengthy delay and attendant costs involved in a jury trial are not warranted here.

Finally, Schuoler challenges the absence of substantive criteria for the decision to administer ECT. We agree that such a decision cannot be left to the unguided discretion of a judge. *Youngberg v. Romeo,* 457 U.S. 307, 321, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982). However, in our discussion above we decided that before a court orders ECT it must consider and set forth findings on (1) the desires of the patient or a substituted judgment by the court, (2) the State's interest in the treatment, and (3) the necessity for and effectiveness of the treatment. These requirements provide the necessary limits to the trial court's discretion.

We also note that a trial court can limit the mental health professionals' discretion to administer ECT. We agree with the Colorado court that "[i]f the court grants the order for involuntary medication, it may place such time limits and conditions on the administration of the medication as are appropriate under the circumstances of the case." *People v. Medina,* 705 P.2d 961, 974 (Colo. 1985).

E

ABUSE OF DISCRETION

Schuoler challenges the trial court's refusal to grant her attorney's request for a continuance as an abuse of discretion. We have said that:

> Where the decision or order of the trial court is a matter of discretion, it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.
>
> Whether this discretion is based on untenable grounds, or is manifestly unreasonable, or is arbitrarily exercised, depends upon the comparative and compelling public or private interests of those affected by the order or decision and the comparative weight of the reasons for and against the decision one way or the other.

(Citations omitted.) *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

We agree with Schuoler that in these circumstances the court abused its discretion. The due process and statutory protections discussed above are meaningless if the patient's attorney does not have an opportunity to adequately prepare for the hearing. Schuoler's attorney had, at most, 24 hours to prepare for the ECT hearing. She had no access to many of Schuoler's medical records, including records involving prior ECT treatments. She had no opportunity to contact members of Schuoler's family. She had no opportunity to select her own expert witness to testify. She had no time to talk to either one of the experts provided her by the prosecutor.

At stake at the ECT hearing was Schuoler's statutory and constitutional right to refuse electroconvulsive therapy. Yet we have no assurance that the court heard Schuoler's side of the issues. The transcript of the ECT hearing leaves the distinct impression that because Schuoler's attorney was not able to prepare, she was not able to ensure that the trial court heard the complete story of Schuoler's situation. The court's denial of the continuance significantly injured Schuoler's attorney's ability to protect Schuoler's rights.

At the same time, a continuance would not have significantly injured state interests. No emergency existed here. At the time of the hearing drug therapy was available for Ms. Schuoler, so that ECT was not immediately necessary. Physicians' testimony at the ECT hearing revealed that in any event her ECT treatment probably could not be completed within 2 weeks. A slight delay for the ECT hearing would have had little impact on the state's interest in beginning ECT. We conclude that in these circumstances the trial court's actions were manifestly unreasonable and therefore an abuse of discretion.

Treatment of the mentally ill is one of the most significant problems facing the public today. We hesitate to frustrate professionals' efforts to treat mentally ill individuals as quickly and efficiently as possible. We also acknowledge that ECT can be a useful treatment for certain patients. Nevertheless, we cannot forget the statutory and constitutional rights of individuals afflicted with poorly understood mental illnesses. We thus conclude that a court can order ECT for a nonconsenting patient only after considering and setting forth findings on (1) the nature of the patient's desires, (2) whether the State has a significant interest in treatment, and (3) whether ECT is necessary and effective to satisfy the state interest implicated. We also conclude that a court must allow a patient's attorney adequate time to prepare for an ECT hearing. In this case the court failed to make a substituted judgment about Schuoler's desires, and abused its discretion by denying her attorney's request for a continuance.

DOLLIVER, C.J., and BRACHTENBACH, DORE, PEARSON, CALLOW, GOODLOE, and DURHAM, JJ., concur.

ANDERSEN, J., concurs in the result.